# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7756 | **DATE** | 9/28/2004 |
| **CASE TITLE** | Miller, et al. vs. American Airlines, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the attached Memorandum Opinion and Order, the Court finds that this case involves a minor dispute, that precludes this ADEA action pending completion of the arbitral processes created by the RLA. The Court therefore stays this case until arbitration under the RLA is complete. As a result, American's motion to dismiss under Rule 12(b)(1) is denied without prejudice (doc. # 14-1), and American's Rule 12(b)(6) motion (doc. # 14-2) and for summary judgment under Rule 56 (doc. # 14-3) are denied as moot.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 29 2004 | |
| | Notified counsel by telephone. | | date docketed | 25 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| mm | courtroom deputy's initials | 2004 SEP 29 AM 10:00 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



SEP 2 9 2004

LOUIS MILLER and )
RICHARD J. ROYALS, )
  )
      Plaintiffs, ) No. 03 C 7756
  ) Magistrate Judge Schenkier
vs. )
  )
AMERICAN AIRLINES, INC. )
  )
      Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

The defendant, American Airlines, Inc. ("American"), has filed a motion to dismiss, pursuant to Federal Rule of Civil Procedure ("Rule) 12(b) (1) and (b) (6), or in the alternative, for summary judgment pursuant to Rule 56. American's motion seeks dismissal of a two-count complaint filed by the plaintiffs, Louis W. Miller and Richard J. Royals, who each allege violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*

The threshold issue presented by American's motion involves a question of preclusion under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"), that challenges the Court's subject matter jurisdiction. As we explain below, we conclude that this case presents a question of interpretation of a collective bargaining agreement ("CBA") that falls within the exclusive jurisdiction of the arbitral process created by the RLA. But, rather than dismissing this case, as requested by American, we follow the Seventh Circuit's instruction in *Tice v. American Airlines, Inc.*, 288 F.3d 313, 318-19 (7th Cir. 2002), and stay the case pending resolution, through arbitration, of the CBA interpretation

---

[1] On April 20, 2004, by consent of the parties, this case was reassigned to this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 (*see* doc. ## 10-12).



issues involved in this case. Accordingly, American's motion to dismiss pursuant to Rule 12(b)(1) is denied without prejudice (doc. # 14-1), and American's alternative motions, to dismiss under Rule 12(b)(6) for failure to state a claim (doc. # 14-2) and for summary judgment under Rule 56 (doc. # 14-3), are denied as moot.

I.

American's motion raises the threshold procedural issue of whether the motion should be dismissed pursuant to Rule 12(b)(1), 12(b)(6) or Rule 56. As indicated, a related issue (not raised by the parties) is also embedded in this motion, namely, whether the case should be stayed, rather than dismissed, upon a finding that the RLA precludes this Court from adjudicating questions of interpretation of the CBA that underlie plaintiffs' ADEA claims. As we indicated above, and for reasons we explain in more detail below, we conclude that the case should be stayed rather than dismissed, pursuant to *Tice*. However, whether the result of RLA preclusion is the dismissal or stay of the case, the question presented by American's motion implicates the Court's subject matter jurisdiction. Therefore, we treat American's motion as one under Rule 12(b)(1) and, as a result, we "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (quoting *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979)).

We hasten to note that in doing so, we do not transform the Rule 12(b)(1) motion into one for summary judgment under Rule 56. Unlike Rule 12(b)(6) motions, Rule 12(b)(1) motions for lack of subject matter jurisdiction are not transformed into Rule 56 motions for summary judgment simply because matters outside the pleadings are presented or considered. "Indisputably, a district court can transform a motion for dismissal under Federal Rule 12(b)(6) into one for summary

2

judgment when "matters outside the pleadings are presented to and not excluded by the court . . . ." Fed.R.Civ.P. 12(b). But, "the Federal Rules of Civil Procedure contain no analogous recognition that a 12(b)(1) motion can evolve into dismissal pursuant to Rule 56." *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986) ("The omission from the Federal Rules of Civil Procedure of a provision for converting a Rule 12(b)(1) motion into a summary judgment motion if evidence is submitted with it was not an oversight."). "Whereas a grant of summary judgment is a decision on the merits, . . . a court must dismiss the case without ever reaching the merits if it concludes that it has no jurisdiction. In short, the question of jurisdiction is inappropriate for summary judgment, and discussing the interplay of Rule 12(b)(1) and Rule 56 verges on non sequitur." *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1999) (citations omitted).

With these procedural considerations in mind, we consider the undisputed evidence submitted by the parties insofar as it is relevant to determine the Court's subject matter jurisdiction.

## II.

The plaintiffs previously worked as Flight Engineers ("FEs") for American Airlines (American's Local Rule 56.1 Statement of Undisputed Material Facts ¶ 1, hereinafter "SMF ___"). American hired Mr. Miller in 1955 and Mr. Royals in 1952 (SMF ¶ 2). As FEs, the plaintiffs were unionized employees represented by the Flight Engineers' International Association (the "FEIA") (SMF ¶ 3). Throughout American's history, FEs have worked only in the third-seat of the aircraft (SMF ¶ 5). In the 1940's, prior to the introduction of commercial jet aircraft, American utilized FEs to serve in the third seat of its propeller-driven aircraft and FEs were not required to be pilots (SMF ¶ 6). Most FEs came from mechanical or maintenance backgrounds. *Id.* In 1958, President Eisenhower appointed a Presidential Fact Finding Board and in July 1958, that Board recommended

that third-seat crew members on turbo jet aircraft become pilot-qualified (SMF ¶ 7). American then began to hire pilots, as opposed to FEs, for that third seat (Am. Mem. at 2).

As a result, in the early 1960s, a jurisdictional dispute ensued between the Allied Pilots Association (the "APA") and the FEIA. American, the APA and the FEIA finally resolved this dispute by entering into a "Tripartite Agreement," executed on December 11, 1964. The parties described it as "a permanent resolution of a long-standing problem" (SMF ¶ 8). That Agreement recognized FEIA as the exclusive bargaining representative of the existing FEs. *Id.* Thereunder, existing FEs, including plaintiffs, were grandfathered in and allowed to serve out their careers as "professional" FEs (SMF ¶ 9).

Given the creation of professional FEs, American, the APA and the FEIA negotiated a supplement to the Tripartite Agreement. Enacted on August 12, 1983, Supplement U provides:

> In the event a surplus of flight engineers exists, each flight engineer so affected, who is qualified or trainable, will be guaranteed placement within the Company in a position not covered by the FEIA Collective Bargaining Agreement. If not qualified, such employee shall be afforded training to enable satisfactory performance in the job in which placed. Such flight engineer must perform the duties in accordance with his new work assignments and schedules as required by the job in which he is placed.
>
> At the time of placement, the employee's monthly salary will be fixed based on the average of his earnings for the previous twelve (12) months as a flight engineer. If the employee's average monthly earnings as a flight engineer exceed the total monthly compensation actually earned in his new job, the employee will be paid such flight engineer's guaranteed monthly earnings. Such guarantee will be in effect until his normal flight engineer retirement date and, thereafter, his salary will be governed by the compensation plan applicable to the new position.

(SMF ¶¶ 10-11). Supplement U ensured that if three-seat aircraft were eliminated, FEs would continue to receive the same rate of pay (in whatever alternate job they held) until they reached the

4

"normal flight engineer retirement date,"[2] which would have the effect of permitting their pension payments to be based on the highest Final Average Compensation possible (SMF ¶ 13).[3]

In May 2002, American grounded the last remaining three-seat craft. Plaintiffs and one other FE were the only remaining FEs employed at that time, and both plaintiffs had reached Normal Retirement Age and were vested in their Pension (SMF ¶ 17). After plaintiffs' jobs had been eliminated, American offered them alternate positions as Staff Assistants (SMF ¶ 18). American interpreted Supplement U as meaning that these positions would be "governed by the compensation plan applicable to the new position," since the plaintiffs already had reached normal retirement age (SMF ¶ 19). Plaintiffs assert that the wage offered was $13.25 per hour (Pls.' Resp. at 2). Plaintiffs declined these positions and, instead, elected to receive a payout under the Pension Plan: Mr. Miller received $649,363.21, and Mr. Royals received $983,923.24 (SMF ¶ 21).

The plaintiffs then filed EEOC charges alleging age discrimination (SMF ¶ 22). In their charges, plaintiffs alleged that the Tripartite Agreement guaranteed them another position of comparable salary when their positions were eliminated. Specifically, each plaintiff alleged as follows: "I was not offered a position with a comparable salary *as required by the Tripartite Agreement.*" *Id.* (emphasis added). American denied plaintiffs' ADEA claims, and argued in its

---

[2]The parties appear to treat the phrase "normal flight engineer retirement date" as synonymous with the term "Normal Retirement Age" which is found in American's Pension Plan (*i.e.*, normal retirement age is when an employee may elect to take full Pension: "A Member who attains this Normal Retirement Age shall have a Vested right to his entire Retirement Benefit" (SMF ¶¶ 14, 20)). Under that plan, the age of 65 qualified as the "Normal Retirement Age" and thus, according to the parties, also qualifies as the "normal flight engineer retirement date" (Am.'s Mem. at 3-4; Pls.' Resp. at 3). We point out that "normal" retirement age clearly does not mean "mandatory" retirement age, as plaintiffs were still working as FEs at ages 70 and 74, respectively (Am.'s Ex. 6, Burdette Decl., Att. A. (EEOC Charges)).

[3]"Final Average Compensation" means "the arithmetical average of a Member's annual Compensation for the sixty (60) consecutive months out of the one hundred twenty (120) consecutive calendar months of the Members' Credited Service net preceding the date of the Member's termination of employment as an Eligible Employee (including the month in which such date falls) which produce the highest twelve (12) consecutive month average" (SMF ¶ 13).

responses to the charges that such a dispute was "preempted" by the RLA because it required an interpretation of the Tripartite Agreement (SMF ¶ 22).

After receiving their notices of a right to sue, plaintiffs filed this lawsuit. In this Court, they continued to allege, as they did in the EEOC charges, that the Tripartite Agreement "require[d]" American to provide them with a position of comparable salary (SMF ¶ 25). Plaintiffs' complaint alleges that American "promised" them "a position which provided equal compensation" (SMF ¶ 24). Moreover, during discovery, plaintiffs further confirmed that this was their theory of the case.

In responding to requests to admit, plaintiffs admitted that their allegations in the complaint were based on a claim in the EEOC charge, a claim alleging that the Tripartite Agreement required American to provide them with positions which paid salaries comparable to their salaries as FEs (SMF ¶ 25). And, in response to American's requests for production of documents in this case, plaintiffs again confirmed that their ADEA claims were premised on their position that Supplement U to the Tripartite Agreement "guaranteed" plaintiffs "continued employment in a position which provided equal compensation:"

> *Defendant's Document Request Nos. 2 and 4 to Plaintiffs:*
>
> [Provide and produce] [a]ny and all written employment agreements between American and Plaintiff Miller [Royals] that would guarantee him continued employment in a position which provided equal compensation. If such documents allegedly exist, identify which portion of the document provides such promise.
>
> *Discovery Response from Plaintiffs Miller and Royals:*
>
> See Response to Request to Produce No. 1, <u>specifically Supplement "U" of the Agreement between defendant and its Flight Engineers.</u>

(SMF ¶ 27) (emphasis in original). In this lawsuit, American has continued to dispute plaintiffs' interpretation of Supplement U (SMF ¶ 28).

## III.

Based on the foregoing undisputed facts, it is clear that the parties' dispute concerns the proper interpretation of the Tripartite Agreement and, in particular, Supplement U. The specific issue the parties are disputing is this: whether Supplement U required American to pay the plaintiffs a comparable salary to the one they received before their FE jobs were eliminated. That dispute raises a jurisdictional issue: namely, whether the mandatory arbitration provision of the RLA strips this Court of subject matter jurisdiction and "precludes" plaintiffs from proceeding with their ADEA claims in federal court.[4] The answer, here, is that it does – at least for now.

### A.

"Arbitral boards established pursuant to the Railway Labor Act have exclusive jurisdiction to resolve disputes over the application of collective bargaining agreements in the railroad and airline industries." *Tice v. American Airlines, Inc.*, 288 F.3d 313, 314 (7th Cir. 2002) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252-53 (1994)). "Specifically, the RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes – 'major disputes' and 'minor disputes.'" *See Brown v. Illinois Central Railroad*, 254 F.3d 654, 658 (7th Cir. 2001); 45 U.S.C. § 151a. Major disputes "relate to the formation of collective bargaining agreements or efforts to secure them." *Hawaiian Airlines*, 512 U.S. at 252 (citations and quotations omitted).

---

[4]American frames the question as one of "preemption," rather than "preclusion." However, in *Brown v. Illinois Central Railroad Co.*, 254 F.3d 654 (7th Cir. 2001), the Seventh Circuit explained that, in cases that involve claims arising under a federal statute (rather than state law), the issue of whether the RLA takes precedence over an independent federal claim is a question of "preclusion" and not "preemption." *Id.* at 661-62.

Minor disputes, by contrast, "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," *Hawaiian Airline*, 572 U.S. at 252-53, and involve "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Id.* at 253.

> All minor disputes must be adjudicated under RLA mechanisms, which include an employer's internal dispute-resolution procedures and an adjustment board established by the unions and the employer. A plaintiff's claim is properly characterized as a minor dispute (and is therefore subject to mandatory and exclusive arbitration under the RLA) when the resolution of the plaintiff's claim requires interpretation of the CBA.

*See Brown v. Illinois Central Railroad Co.*, 254 F.3d 654, 658 (7th Cir. 2001) (citing *Monroe v. Missouri Pacific R.R. Co.*, 115 F.3d 514, 519 (7th Cir. 1997), and *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583 (7th Cir. 1999) (stating that "[t]he distinguishing feature of a minor dispute is that the dispute can be conclusively resolved by interpreting the existing CBA")). In determining whether the RLA precludes a federal claim because it involves a minor dispute, courts employ a two-step analysis.

A court must first determine whether the dispute between the parties is "minor," as defined by the RLA. *See Brown*, 254 F.3d at 661-62. *Cf. Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583-84 (7th Cir. 1999) (taking harmonization question first). The Seventh Circuit instructs that "courts should characterize a dispute as minor if it is even 'arguably justified' that the dispute turns on the application of the CBA." *Coker*, 165 F.3d at 583, 584 (referring to this as a "solicitous standard"); *see also Brown*, 254 F.3d at 658 (a claim involves a minor dispute if "it cannot be adjudicated without interpreting the CBA, . . .").

If the answer to that question is yes, the next question is whether the RLA and the federal statute upon which plaintiff's claim depends are incompatible or whether they can be "harmonized." "Harmony," in this context, means that the RLA and the underlying statute upon which plaintiff's claim is based can be given "simultaneous effect," *Brown,* 254 F.3d at 662, without any discordance to the expressed intent of Congress in either statute. *Id.* at 663 (RLA applies where there is "no clear Congressional intent to override the RLA's requirement that minor disputes be adjudicated exclusively through [its'] arbitration machinery"). *See also United States v. Palumbo Bros., Inc.,* 145 F.3d 850, 865 (7th Cir. 1998) ("Absent a clearly expressed intention that Congress intended one federal statute to preempt another, courts must regard each as effective and give them simultaneous effect"). In other words, the goal is to adjudicate claims under one statute "without doing actual violence to the competing statute." *Id.* at 668.

Seventh Circuit law makes it clear that absent a "clear Congressional intent" to the contrary, this harmonization process will result in the RLA arbitral process being given precedence over the competing federal statute. *Brown,* 254 F.3d at 663. To allow a claim based on a competing federal statute to proceed in federal court when a minor dispute exists "would sanction a judicial incursion into what the RLA defines as the exclusive province of CBAs. This would 'lead to the evisceration of the grievance and arbitration procedures provided by the RLA.'" *Id.* at 664 (quoting *Schlitz v. Burlington Northern R.R.,* 115 F.3d 1407, 1415 (8th Cir. 1997)). Accordingly, unless there is evidence that, in passing the competing federal statute, Congress intended to override the "requirement that minor disputes be adjudicated exclusively through the RLA's arbitration machinery," *Brown,* 254 F.3d at 663, once a court finds the existence of a minor dispute the RLA will always be given primacy in the harmonization determination.

## B.

Thus, analysis of the present dispute boils down to two questions: (1) is the parties' dispute regarding interpretation of the Tripartite Agreement and Supplement U a "minor" dispute, and, if so, (2) whether there is persuasive evidence that Congress intended to override the grant of exclusive jurisdiction to the RLA arbitral process and to allow that dispute to be judicially-resolved in ADEA cases. We take the minor dispute question first, as did the appeals court in *Brown,* because we think that is the natural place to start. If there is not a minor dispute, then there is no need to decide whether the RLA and the ADEA can be harmonized. *Brown,* 254 F.3d at 661-62.

### 1.

The Court finds that the dispute in this case is "minor" as defined by the RLA. The plaintiffs' EEOC charges, the predicate upon which this lawsuit is formed, frame the issue in this litigation as follows: they were "forced to retire" and "subjected to different terms and conditions of employment," and they were "not offered a position with a comparable salary as required by [the] Tripartite Agreement" because they were "beyond normal retirement age" when American grounded the 727 jets (Am.'s Ex. A, Burdette Aff., Att. E (EEOC Charges of Miller and Royals)) (emphasis added). As demonstrated by the undisputed facts set forth above, in this Court the plaintiffs have repeatedly reaffirmed that their ADEA claims are premised on the theory that American deprived them, on account of age, of a comparable salary that the Tripartite Agreement guaranteed: they have made that allegation in their complaint, and they have admitted that this is their claim in discovery responses. And, it is equally clear that American disputes plaintiffs' contractual interpretation.

To resolve the parties' dispute about whether there was a contractual requirement to provide the plaintiffs with a comparable salary, the Tripartite Agreement and Supplement U must be

interpreted. And, that interpretation is necessary to resolving the merits of plaintiffs' ADEA claims. Under well-settled law, this establishes that plaintiffs' ADEA claims involve a minor dispute. *E.g., Brown*, 254 F.3d at 668 (a claim involves a minor dispute if "it cannot be adjudicated without interpreting the CBA, . . .").

The plaintiffs nonetheless argue that this case does not present a "minor dispute," because the parties agree on what "normal retirement age" means (*i.e.*, age 65), and this term is the only one relevant to the dispute regarding comparable salary (Pls.' Mem. at 4). The Court finds this argument meritless. By emphasizing that the parties agree that they understood what the "normal retirement age" *is* (*i.e.*, age 65), plaintiffs beg the question of what the "normal retirement age" *means* in the context of Supplement U to the Tripartite Agreement. And, it is that latter question that presents an issue of contract interpretation that is critical to plaintiffs' ADEA claims. Indeed, the fact that the parties spar about the purposes of the Tripartite Agreement (*compare* Pls.' Mem. at 2 *and* Am.'s Reply Mem. at 6) further demonstrates that the parties' agreement about the numeric "normal retirement age" far from resolves their more fundamental dispute about whether the contract provides plaintiffs with the salary guarantee they claim.

The Seventh Circuit has made clear that the interpretation of a collective bargaining agreement to determine if a claimed right exists must be left to the arbitral mechanisms established under the RLA. *Tice v. American Airlines, Inc.*, 288 F.3d 313, 317 (7th Cir. 2002). This is just such a case. Accordingly, the Court finds, under the legal precedent summarized above, that this case presents a minor dispute, as defined by the RLA.

## 2.

Having so concluded, the Court next must decide whether the ADEA and RLA can be "harmonized." In considering that question, we follow the Seventh Circuit's direction that "the preemption standards should govern in a preclusion case unless the analysis of the two federal statutes clearly suggest otherwise." *Brown*, 254 F.3d at 662-63.

Plaintiffs have pointed to nothing in the language or legislative history of the ADEA reflecting a "clear Congressional intent to override the RLA's requirement that minor disputes be adjudicated exclusively through the RLA's arbitration machinery." *Brown*, 254 F.3d at 663 (ADA claim held precluded). In *Tice v. American Airlines, Inc.*, 288 F.3d 313, 318 (7th Cir. 2002), the appeals court held that the plaintiffs were barred from proceeding with ADEA claims whose resolution depended upon an interpretation of a collective bargaining agreement. In so holding, the Seventh Circuit explained at length why the preclusion analysis requires that minor disputes be resolved through the RLA arbitral process:

> The interpretation of a contract does not take place in a vacuum; it is not a purely semantic exercise; it has regard for the consequences of alternative interpretations, the parties being assumed to have intended something sensible by their contract. . . . That is why we have said that 'to interpret a contract or other document, it is not enough to have command of the grammar, syntax, and vocabulary of the language in which the document is written. One must know something about the practical as well as the purely verbal context of the language to be interpreted.' (Citations omitted). . . This insight lies behind the frequently stated proposition that labor arbitrators do not merely read the words of the collective bargaining agreement but administer the 'common law of the shop' which is to say the set of practices ('course of dealing,' in the lingo of ordinary contract law) that fill out those words and compete the definition of the parties' agreement sketched in the actual document.

*Tice*, 288 F.3d at 316-17.

12

Plaintiffs have offered no explanation as to why the harmonization analysis here should yield a different result with respect to their ADEA claims than did the harmonization process in *Tice*, and we find none.

## C.

Having concluded that plaintiffs' ADEA claims raise minor disputes that must be resolved through the arbitral process established by the RLA, we are left with the question of precisely what that means for the disposition of plaintiffs' ADEA claims in this Court. On this question, there is some arguable ambiguity in the governing Seventh Circuit law.

In *Brown*, the appeals court concluded that the plaintiff's federal claim was precluded because it was a minor dispute that had to be submitted to arbitration under the RLA; the court therefore affirmed the dismissal of Brown's federal case for lack of subject matter jurisdiction. *Brown*, 254 F.3d at 668. The *Brown* analysis appears to be premised on the view that once it is determined that a minor dispute is involved that "could" dispose of the federal claim, then the federal claim is no longer "truly independent" of the CBA within the meaning of the doctrine established in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), and thus may not proceed at all. *Brown*, 254 F.3d at 668.[5]

In *Tice*, the appeals court concluded that the plaintiffs' federal claims were precluded, but concluded that those claims should be stayed pending arbitration rather than dismissed. 288 F.3d at 318. In reaching that conclusion, the appeals court reasoned that "[w]hen an employee has both

---

[5]In *Gardner-Denver*, the Supreme Court held that because contractual rights arising under a collective bargaining agreement and statutory rights provided by federal employment discrimination laws are independent of one another, an employee is free to pursue each set of rights, albeit in separate forums: the collective bargaining agreement rights through arbitration, and the federal statutory rights through litigation in court. *See* 415 U.S. at 47-49. Indeed, "consideration of the claim by both forums may promote the policies underlying each." *Id.* at 50.

a contractual right by virtue of a collective bargaining agreement (or other employment contract), and a statutory right to be free from discrimination, 'both rights have legally independent origins and are equally available to the aggrieved employee.'" *Id.* at 317 (quoting *Gardner-Denver Co.*, 415 U.S. at 52). The appeals court explained that if the plaintiffs in *Tice* were correct in their contractual interpretation, "they will prevail in the arbitration and be reinstated with backpay," but, they also might "then seek additional relief under the age discrimination law." *Tice*, 288 F.3d at 317. The appeals court stated that "[s]ince it is obviously the intention of the plaintiffs in our case to proceed under the age discrimination law if they can, we think that rather than dismiss the present suit the district judge should have stayed it to await the outcome of the arbitration in order to spare the parties the burden of a second litigation should the arbitrators fail to resolve the entire controversy." *Id.* at 318.

    The *Tice* panel sought to reconcile its analysis with the analysis of the panel in *Brown*:

> We don't think the opinion in *Brown* meant anything different from this, despite the reference to potentially as distinct from actually dispositive arbitration. Brown was trying to avoid the arbitral route – improperly, because his claim depended critically on the resolution of a dispute over the meaning of the collective bargaining agreement, and as the court said there and we have said here, the arbitrators have exclusive jurisdiction over such disputes. *Brown*, . . . 254 F.3d at 658. The court added, consistently with our analysis here, that "the adjudication of Brown's ADA claim cannot go forward *until* Article 55 and the seniority provisions of the CBA are interpreted." *Id.* at 661 (emphasis added). The implication is that if Brown obtained a favorable interpretation from the arbitrators, he could reinstate his suit.

*Tice*, 288 F.3d at 318.

Notwithstanding this explanation, one may fairly debate whether *Tice's* reading of *Brown* is in fact a revision of the analysis employed in that case. It strikes the Court that the different results in *Tice* (staying the case) and *Brown* (dismissing the case) reflect different approaches to the question of when a federal claim is "truly independent" of a collective bargaining agreement. In *Brown*, the appeals court concluded that if there is a minor dispute involved in the federal claim, so that the federal claim "could" (but might not) be conclusively resolved by an interpretation of the collective bargaining agreement, then the federal court must dismiss the federal claim because it is not "truly independent" of the contract interpretation question that must be resolved through the RLA processes. *Brown*, 254 F.3d at 668.

On the other hand, *Tice* reasons that when a minor dispute is present that "could" (but might not) resolve the federal claim, what that means is that the federal case may not proceed until the arbitrator has interpreted the disputed portion of the contract upon which the federal claim depends (*i.e.*, there is a threshold, central issue over which the federal court may not exercise subject matter jurisdiction). However, if the contract interpretation reached in arbitration does not "conclusively" resolve the entire dispute by the parties and the interpretation is consistent with the maintenance of the federal claim, then there is no reason, (absent some other impediment to suit) why a plaintiff cannot come back to federal court to seek independent relief under the appropriate federal statute. This is the meaning that we draw from the statement that "district courts should retain jurisdiction over a suit that must be interrupted for reference of an issue to another forum rather than dismiss it if, should it be dismissed, there might later be grounds for reinstating it." *Tice*, 288 F.3d at 318.

Having identified the possible tension in the approaches used by *Brown* and *Tice* concerning the proper disposition of a federal suit when RLA preclusion applies, we are in no position to resolve

15

it. Compelled to choose between the two approaches, we opt to follow the analysis in *Tice* in this case. *Tice* is the most current pronouncement of the Seventh Circuit on the proper disposition of a federal lawsuit once RLA preclusion has been found to apply; moreover, one of the members of the *Tice* panel also sat on the panel that decided *Brown*, suggesting that at least that judge saw no inconsistency between the analysis in *Brown* and *Tice*. What's more, we think that the analysis in *Tice* makes sense if, as *Tice* suggests, the *Brown* dismissal in fact contemplated that if the plaintiff there "obtained a favorable interpretation from the arbitrators, he could reinstate his suit." *Tice*, 288 F.3d at 318. As between the choice of dismissing a case and leaving it to a plaintiff to try to reinstate it after the arbitration has concluded, and staying the case until the arbitration is concluded, a stay has the advantage of avoiding the possibility of creating potential new statute of limitations issues that might result from a dismissal and subsequent attempt to refile.[6]

Accordingly, employing the analysis in *Tice*, we consider whether there is any ADEA claim that the plaintiffs still may be able to pursue after the RLA process has been completed. At this point, we are unable to conclusively answer that question in the negative.

If the plaintiffs prevail in their interpretation that Supplement U of the Tripartite Agreement guaranteed them a new job at a comparable salary once their FE jobs were eliminated, they would be entitled to relief from the arbitral panel. Under *Tice*, however, there is no reason that they would be foreclosed from seeking relief under the ADEA, if: (1) the federal statute provided other and

---

[6]While we do not know whether the *Brown* panel contemplated the possibility of a new ADA suit being filed after the completion of arbitration (since it did not expressly speak to that point), the dismissal order in that case on its face would not foreclose that possibility. Neither the Seventh Circuit's conclusion dismissing the case for lack of subject matter jurisdiction, *Brown*, 254 F.3d at 668, nor the district court dismissal that if affirmed, No. 97 C 4836, 2000 WL 420855 (N.D. Ill, Apr. 18, 2000), states that the dismissal was with prejudice. And, a dismissal for lack of subject matter jurisdiction "carries no *res judicata* consequences." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1279 (7th Cir. 1983).

additional remedies; and, (2) that relief did not require further interpretation of the collective bargaining agreement. *Tice*, 288 F.3d at 317.

On the other hand, if American prevails in its position that the Tripartite Agreement does not guarantee the plaintiffs a comparable salary, it nonetheless still remains "the intention of the plaintiffs in our case to proceed under the age discrimination law if they can." *Tice*, 288 F.3d at 318. Plaintiffs clearly would argue that if the Tripartite Agreement does not provide a guarantee of a comparable salary to FEs who lose their jobs before normal retirement age (65), but guarantees comparable salary to those who lose their FE positions before normal retirement age, that Agreement itself violates the ADEA. What is not so clear is whether such a claim properly would lie, as American has raised a number of defenses to any such claim: (1) that any ADEA claim attacking a failure of the Tripartite Agreement to provide a salary guarantee to persons in plaintiffs' situation is untimely; (2) that such an attack on the Tripartite Agreement under the ADEA is not "like or related" to the EEOC charges that the plaintiffs filed, and thus would be barred; and (3) that, on the merits, the Tripartite Agreement does not discriminate on the basis of age. We see no basis for reaching those issues at the present time, without knowing whether the Tripartite Agreement will be interpreted in a way that makes those issues relevant to the case.[7]

## CONCLUSION

For the reasons given above, the Court finds that this case involves a minor dispute, that precludes this ADEA action pending completion of the arbitral processes created by the RLA. The Court therefore stays this case until arbitration under the RLA is complete. As a result, American's

---

[7] In light of our disposition of American's motion, we also find it unnecessary to reach the argument that certain responses by the plaintiffs to American's statement of material undisputed facts should be stricken, and the facts offered by American deemed admitted (Am.'s Reply Mem. at 8-10).

17

motion to dismiss under Rule 12(b)(1) is denied without prejudice (doc. # 14-1), and American's Rule 12(b)(6) motion (doc. #14-2) and for summary judgment under Rule 56 (doc. # 14-3) are denied as moot.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: September 28, 2004**